UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JULIANNE BRONSINK
O.B.O. BRIAN LOVELY,

    Plaintiff,          Hon. Janet T. Neff

v.                Case No. 1:10-CV-458

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/


## REPORT AND RECOMMENDATION

    This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security granting in part and

denying in part Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI) under Titles II and XVI of the Social Security Act.  Section 405(g) limits the Court to

a review of the administrative record, and provides that if the Commissioner's decision is supported

by substantial evidence, it shall be conclusive.  Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing

United States Magistrate Judges to submit proposed findings of fact and recommendations for

disposition of social security appeals, the undersigned recommends that the Commissioner's decision

be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

2

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.


## **PROCEDURAL POSTURE**

Plaintiff was 37 years of age on the date of the ALJ's decision.  (Tr. 45, 95).  Plaintiff "has the equivalent of a high school education" and worked previously as a warehouse and factory worker, delivery driver, and construction worker.  (Tr. 39, 116-21).

Plaintiff applied for benefits on October 1, 2004, alleging that he had been disabled since February 28, 2004, due to traumatic brain injury, bilateral leg fractures, knee injuries, and a ruptured kidney.  (Tr. 95-97, 144).  Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 46-94).  On August 23, 2007, Plaintiff appeared before ALJ James Prothro, with testimony offered by Plaintiff, Julie Bronsink, and vocational expert, Paul Delmar.  (Tr. 792-838).  In a written decision dated November 28, 2007, the ALJ determined that Plaintiff was disabled from February 28, 2004, through September 30, 2006, but not thereafter.  (Tr. 25-45).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 5-19).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.


## **RELEVANT MEDICAL HISTORY**

On February 28, 2004, Plaintiff was struck by a motor vehicle while walking.  (Tr. 194).  An examination of Plaintiff's abdomen revealed a "rupture of the right kidney."  (Tr. 286-87).

X-rays of Plaintiff's left ankle revealed "no acute fracture," but did indicate "widening of the lateral ankle mortice suggesting ligamentous injury." (Tr. 284). X-rays of Plaintiff's right knee revealed an "anterior cruciate ligament injury." (Tr. 284-85). X-rays of Plaintiff's left knee revealed "an interarticular fracture of the medial femoral condyle." (Tr. 285). X-rays of Plaintiff's thoracic spine were "normal." (Tr. 282). X-rays of Plaintiff's lumbosacral spine revealed "fractures of the pubic rami," but were "otherwise negative." (Tr. 282-83). A CT scan of Plaintiff's brain revealed "multiple facial and skull fractures," as well as "subarachnoid, subdural and parenchymal hemorrhage." (Tr. 272-73). A CT scan of Plaintiff's chest revealed "a fracture of the medial aspect of the right clavicle" and "a fracture of the left anterior rib." (Tr. 269). A CT scan of Plaintiff's abdomen revealed "a complex fracture of the right kidney" and "fractures of the transverse processes on the right at L1, L2, L3, and L4." (Tr. 269-70). A CT scan of Plaintiff's pelvis revealed "bilateral fractures of the superior and inferior pubic rami." (Tr. 270). A CT scan of Plaintiff's maxillofacial bones revealed "a comminuted fracture of the superior portions of the orbits, the roof of the orbits (floor of the anterior cranial fossa), right frontal bone, and nasal bones." (Tr. 265). An MRI examination of Plaintiff's cervical, thoracic, and lumbar spine revealed "no acute injury." (Tr. 241-43). Plaintiff participated in a bilateral leg Doppler venogram, the results of which were "normal" with "no evidence of deep venous thrombosis." (Tr. 233).

On March 1, 2004, Plaintiff underwent a "right frontal ventriculostomy and placement of intracranial pressure monitoring device." (Tr. 179). On March 11, 2004, Plaintiff underwent surgery to repair the injuries to his left knee. (Tr. 176-77). On March 18, 2004, Plaintiff participated in an electroencephalography examination the results of which revealed "abnormal EEG with some

4

bilateral slowing consistent with a diffuse encephalopathy but with much more impressive slowing over the left hemisphere consistent with more injury to the left hemisphere than the right." (Tr. 189).

Plaintiff was discharged from the hospital on March 29, 2004 at which point he was diagnosed with the following injuries: (1) closed head injury, (2) kidney laceration, (3) fracture of the sacrum and coccyx, (4) hemorrhagic anemia, (5) closed pubic fracture, (6) cerebrospinal rhinorrhea, (7) post traumatic respiratory insufficiency, (8) closed dorsal vertebral fractures, (9) facial bone fractures, (10) clavicle fracture, (11) femoral fracture with dislocation of the knee, and (12) scalp laceration esthesia. (Tr. 172). Upon discharge from the hospital, Plaintiff was transferred to the Spectrum Health Continuing Care Center Subacute Brain Injury Unit. (Tr. 339).

Treatment notes dated April 15, 2004, indicate that Plaintiff "is restless, confused and at times uncooperative." (Tr. 339). It was further noted that Plaintiff "is quite active but very distractable and usually not cooperative." (Tr. 339). It was further observed that Plaintiff "demonstrates poor judgment" and "is not appropriate for group activities." (Tr. 339).

Treatment notes dated May 20, 2004, indicate that Plaintiff "is easily distracted" and "has mild word finding difficulties." (Tr. 336). It was also noted that Plaintiff "continues to be somewhat impulsive and does not follow safety precautions." (Tr. 336). Plaintiff's speech was reported as "clear." (Tr. 336). Plaintiff exhibited "no dysarthria but he does continue to have significant aphasia." (Tr. 336). Treatment notes dated June 4, 2004, indicate that Plaintiff "has significant difficulty with memory and safety awareness." (Tr. 333).

On June 8, 2004, Plaintiff underwent surgery to repair damage to his right knee. (Tr. 318-19). On June 29, 2004, Plaintiff underwent further surgery to repair the damage to his right knee. (Tr. 321-22).

5

On June 22, 2004, Plaintiff was discharged from the Spectrum Health Continuing Care Center.  (Tr. 326-27).  The discharge summary states, in part, as follows:

> Upon admission to our program, [Plaintiff] was awake and answered simple questions but did not consistently follow commands.  Upon discharge, he was independently mobile in a wheelchair.  He was able to respond to commands and hold a conversation.  He continued to have some significant short term memory loss and was very impulsive with poor judgment.  He did complain of some visual changes and was evaluated by [a doctor] who felt that he did have some convergence insufficiency with diplopia and was instructed on how to do eye muscle exercises to help control his symptoms.

(Tr. 326).

On July 23, 2004, Plaintiff participated in a vocational evaluation at Hope Network.  (Tr. 574-79).  The examiner reported that Plaintiff's "visual discrimination was decreased" and that he "had a few memory challenges."  (Tr. 578).  The examiner further reported that Plaintiff's "problem solving, organizational skills, and his divided attention were decreased."  (Tr. 578).  Plaintiff exhibited "good attention to detail, bilateral hand coordination, sequencing and counting skills" and "good. . .eye hand coordination."  (Tr. 578).  The examiner further observed that Plaintiff "had a good attitude" and that his "motor speed and quality was within competitive rates." (Tr. 578).  The examiner concluded that Plaintiff would benefit from participation in the vocational training program and job coaching.  (Tr. 578-79).

Occupational therapy treatment notes dated July 23, 2004, revealed the following:

> Challenges noted: [Plaintiff] has visual acuity challenges that are being addressed by his opthamologist, but also has visual field and visual attention issues.  He struggles with remembering or ignoring his restrictions for use of his leg braces.  Other issues include: self confidence, planning, initiation, and budgeting.

6

> Strengths noted: Despite his limitations, [Plaintiff] has a lot of skills that benefit him greatly.  His upper extremity strength and ROM are within functional limits.  [Plaintiff] is able to physically complete all areas of self care; he only requires cueing to properly wear his leg braces.  One other positive thing for [Plaintiff] is that he sees the potential benefits of regularly attending a substance abuse treatment group.

(Tr. 572).

Treatment notes dated August 3, 2004, indicate that Plaintiff "continues to make nice gains in his Rehab Program here at Hope Network."  (Tr. 451).

On August 4, 2004, Plaintiff participated in a neuropsychiatric evaluation conducted by Dr. Robert Holwerda.  (Tr. 534-39).  Plaintiff "appeared somewhat dysthymic with a more restricted affect."  (Tr. 538).  Plaintiff exhibited "fair" eye contact and his speech "was normal rate and rhythm."  (Tr. 538).  Plaintiff's "thoughts did tend to get somewhat circumstantial," but "no overt symptoms of psychosis were noted."  (Tr. 538).  The doctor further noted that:

> On a Mini Mental State Exam, he scored 27 out of 30, missing the day of the week by one, reporting it as Tuesday instead of Wednesday.  He was not quite sure of my last name, although he did know the first letter of my last name, and was having difficulty with the last step of a three-step command.  He also had difficulty with a serial subtraction of 3 from 100, missing one step...I did not do a more formal Mental Status Exam with him.  Insight at this time is impaired.  The team reports that he continues to show poor judgment as far as taking off his braces, despite reporting to us that he has been told he has a 98% chance of re-breaking his legs because of the instability at the knees.  He has even gone as far as to fall one time with his son, while carrying him without his braces on.  He is agreeable with looking at medication trials.  He is agreeable with continuing to abstain from alcohol, or at least verbalizes that at this point.  Judgment is impaired as evidenced by some of his behaviors as described above, although he is denying current suicidal or homicidal thoughts and does not experience hallucinations.  Some mild paranoia might be present.  Estimate of his IQ based on vocabulary and education level...would be low to moderate.

7

(Tr. 538).

Dr. Holwerda diagnosed Plaintiff with alcohol dependence, in partial remission, and cocaine abuse and cannabis abuse in sustained remission.  (Tr. 538).  Plaintiff's GAF score was rated as 50.[1]  (Tr. 539).

Treatment notes authored by Dr. Holwerda on August 18, 2004, indicate that Plaintiff was "a little more irritable" and experiencing "some hypomanic symptoms."  (Tr. 525).  Plaintiff's medication regimen was modified.  (Tr. 525).

On August 20, 2004, Plaintiff was examined by Dr. Holwerda.  (Tr. 522-23).  Plaintiff reported that "he is doing good" and "feels that the increase in the Seroquel has been helpful."  (Tr. 522).  Plaintiff indicated "that his moods have been less irritable over the last few weeks, and he is getting along better with people."  (Tr. 522).  Plaintiff also reported that "his thoughts are slowing down and that he is not worrying as much about his children and lawyers, and so forth."  (Tr. 522). Plaintiff's case manager reported that Plaintiff "has been doing fairly well," other than a recent incident in which Plaintiff "went on AWOL status with a woman who was on a restricted-visitation list."  (Tr. 522).

On September 19, 2004, Plaintiff described his moods as "okay."  (Tr. 502).  Dr. Holwerda reported that Plaintiff experiences "bipolar disorder with mood lability and impulsiveness that seems to be controlled with the Seroquel."  (Tr. 502).  Treatment notes dated October 2, 2004,

---

[1]  The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV).  A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning."  DSM-IV at 34.

indicate that Plaintiff went AWOL from his residential facility the previous night and "had gone to a club."  (Tr. 492).

On October 6, 2004, Plaintiff "was discharged from comprehensive brain injury rehabilitation because of his failure to actively participate in programing and continued violations of the alcohol use and abuse policy."  (Tr. 491).  It was further noted that:

> [Plaintiff] consistently lied to team members about his activities and more information was available that he had been consistently using alcohol during his rehabilitation.  He continued to struggle with his commitment to giving up his alcohol dependence and taking more responsibility for a healthy lifestyle and active participation in alcohol rehabilitation and brain injury rehabilitation.  He continued to blame others for his problems and tell team members alternate stories about why he was having trouble in other therapies.  At no time was [Plaintiff] honest about his behavior even when he was confronted with his lies and duplicity.  He also failed to accept the severity of his bipolar mood disorder.  There was more and more evidence that his antisocial personality traits constituted a full blown character disorder which contributed to lack of conscience to guide his behavior.  He was discharged to residential alcohol treatment and rehabilitation which was the appropriate treatment modality for him at this time.  He would be appropriate for continued comprehensive brain injury rehabilitation if he is able to develop an effective plan for and continue to participate in an effective program to manage his alcohol dependence.  His prognosis for making this commitment and participating in this type of programming is poor.  I [made] very little progress with [Plaintiff] in his rehabilitation because of his constant, chronic lies and deceit which did not allow us to [deal] with real behaviors and choices.  We were always discussing some deceitful representation of his behavior.  As it turned out he had not been honest with anyone on his team.  Long-term he will need a consistent program to help with developing and maintaining sobriety and abstinence from alcohol and all other drugs, psychological treatment for mental illness, character disorder, and history of childhood, and conflicts, and psychiatric treatment for mood and thought disorders.

(Tr. 491-491a).

On October 11, 2004, Plaintiff was examined by Ken Hasseler, Ph.D., a licensed psychologist with Hope Network. (Tr. 466-73). Plaintiff participated in an MMPI-II evaluation the results of which revealed:

> A valid profile in which he appeared to respond forthrightly to the statements, which was somewhat surprising based on other behavioral evidence of his defensiveness and avoidance of confronting or facing problems. The most salient features in his profile revealed anger, hostility, and resentfulness, which was likely to contribute to rebelliousness. This revealed significant antisocial features in his personality, which would include behaviors of lying, cheating, stealing, sexual acting out and excessive alcohol or drug abuse and dependence. Other clinically significant features or traits in his personality included the following: Affectively, his profile revealed the previously mentioned excessive anger and hostility. Underlying this is deep insecurity with a very low frustration tolerance. He is likely to present as moody, irritable, and caustic. Cognitively, his profile revealed clinically significant poor self concept. He sets himself up for rejection and failure in a self-defeating manner. He sees the world as a threatening rejecting place and withdraws and strikes out in anger. His profile reveals that he is obsessed with sexual thoughts and probably fears his ability to perform sexually as a man. Because of his poorly developed conscience he is likely to engage in antisocial behaviors, including criminal sexual acts to overcome his sense of inadequacy. His psychological defenses included excessive blaming of others or projection and rationalization of his problems. Behaviorally he appears ambitious, energetic, and overactive on the surface. Unfortunately, his activity is most often associated with stimulus, excitement, and sensation seeking behaviors. When there are problems he accepts little or no responsibility for his behavior. He is impulsive and cannot delay his gratification. He constantly shows poor judgment and does not learn from his experience. His profile reveals that he is capable of vicious assaultive crimes. As previously mentioned, he also is significantly prone toward excessive alcohol or drug abuse and dependence. Interpersonally, he is immature, selfish, indulgent, and dependent. He has very exaggerated needs for attention and affection with impaired empathy. He manipulates others to meet his own need. His profile revealed that he is distrustful and avoids close relationships. In summary, there is evidence of very significant emotional and cognitive problems interfering with his social and vocational

> functioning. The severe psychological problems contribute to his
> inability to make safe, independent decisions.

(Tr. 471).

Dr. Hasseler diagnosed Plaintiff with: (1) cognitive disorder, not otherwise specified; (2) bipolar I disorder, most recent episode mixed, severe, with psychotic features; (3) alcohol dependence; and (4) antisocial personality disorder. (Tr. 472). Plaintiff's GAF score was rated as 45.[2] (Tr. 472).

On February 4, 2005, Plaintiff was examined by Dr. Kim Eastman. (Tr. 436). An examination of Plaintiff's left knee revealed "good ligamentous stability." (Tr. 436). The doctor noted that Plaintiff's left knee was "doing reasonably well with symptomatic arthritis." (Tr. 436). An examination of Plaintiff's right knee, however, revealed that it "is very loose and unstable." (Tr. 436). The doctor concluded that Plaintiff required further reconstruction surgery for his right knee. (Tr. 436).

On March 4, 2005, Plaintiff participated in a consultive examination conducted by Dr. June Hillelson. (Tr. 384-94). Plaintiff was "very slow to answer questions, however, there was no evidence of expressive aphasia or dysarthria." (Tr. 387). Plaintiff exhibited 5/5 motor strength throughout his upper and lower extremities with no evidence of atrophy. (Tr. 387). Plaintiff was wearing full length bilateral leg braces with which he was able to ambulate. (Tr. 386-87). Without his leg braces, Plaintiff's "gait was slow and wide and he demonstrated loss of balance." (Tr. 387). The doctor concluded that:

---

[2] A GAF score of 49 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

11

> This gentleman is lucky to be alive and even with the braces, he is lucky to be walking, however, it seems that his responses were slow and he still might be suffering from residual effects of that traumatic brain injury, which certainly would be understandable. It is felt that he will probably need those braces for a considerable period of time, although this would be up to his orthopedic surgeon. At this point in time, it is felt that he should not be standing, walking, stooping, squatting or bending or putting much stress on his lower extremities. His upper extremities work just fine. It is felt that he also may have some psychological problems from this injury and it is felt that an MMPI study should be done, or at least an evaluation by a psychologist or a psychiatrist to see exactly how good his judgment would be. At this point in time, it is felt that he cannot pursue his sports, hobbies, nor can he be building homes. He probably could pursue some types of duties of a sedentary nature, but again, he needs a psychological evaluation.

(Tr. 387).

On March 22, 2005, Plaintiff underwent surgery on his right knee to repair tears to his right anterior cruciate ligament and his medial collateral ligament. (Tr. 410-12). On June 20, 2005, Plaintiff was examined by Dr. Eastman. (Tr. 429). Plaintiff reported that his "right knee is stable," but that "his left knee gives him a lot of aching discomfort and pain." (Tr. 429).

On August 26, 2005, Plaintiff was examined by Beth Blackbird, Ph.D. (Tr. 663). Plaintiff reported that he "is doing better emotionally" and "plans to return to work on Monday, August 29." (Tr. 663).

On September 23, 2005, Plaintiff was examined by Dr. Eastman. (Tr. 427). The doctor reported that Plaintiff "has been working diligently in physical therapy getting his range of motion and strength up." (Tr. 427). Plaintiff reported that "he is now to the point where he can get around quite well" and "is actually doing a little bit of bicycling and roller blading." (Tr. 427). Dr.

12

Eastman noted that Plaintiff "actually comes in requesting trying to get back to work as he is feeling

stronger." (Tr. 427). The doctor concluded that:

> I am going to allow him to return to work with restrictions. No
> climbing or squatting and he should not be going up and down
> ladders. Sit as needed. He feels he can lift and carry heavy objects,
> so we are going to allow him to do that. He can do light to medium
> type tasks probably. A lot of it will be the specifics of his job. He
> will probably have to get off his feet occasionally. I can't foresee him
> standing and walking all day long carrying heavy objects, but he can
> certainly try physical things and see how he does.

(Tr. 427).

On September 30, 2005, Dr. Blackbird reported that Plaintiff "needs the structure,

security and support [of adult foster care] before he can eventually move into a more independent

setting." (Tr. 661).

On October 28, 2005, Plaintiff was examined by Dr. Blackbird. (Tr. 660). Plaintiff

reported that his treatment with her "helps him to not be depressed and less stressed." (Tr. 660).

Plaintiff also reported that he was "less prone to getting into a temper." (Tr. 660). Plaintiff also

reported that "he has been working for four weeks." (Tr. 660).

On January 13, 2006, Plaintiff was examined by Dr. Eastman. (Tr. 425). Plaintiff

reported that he was experiencing left knee pain. (Tr. 425). Plaintiff reported that "he tried to go

back and do some construction work for awhile and it just wasn't going to happen." (Tr. 425). The

doctor "reiterated [to Plaintiff] that he should not be doing construction work with his knees." (Tr.

425). The doctor concluded that Plaintiff "has to get into a lighter type of work." (Tr. 425).

Treatment notes authored by Dr. Blackbird on January 26, 2006, indicate that Plaintiff "has made

some good gains." (Tr. 654).

13

On February 1, 2006, Plaintiff was examined by Dr. Holwerda. (Tr. 457). The doctor noted that he last met with Plaintiff on January 13, 2006, at which point he "started him on Wellbutrin." (Tr. 457). Plaintiff reported that he "is maybe doing a little better" and "can identify less irritability." (Tr. 457). Plaintiff reported that he "has been participating pretty well in therapies, as well as in his substance abuse program." (Tr. 457).

On February 3, 2006, Dr. Blackbird reported that Plaintiff had exhibited "good handling of a tense situation with another resident at Hope this week." (Tr. 653). The doctor noted that Plaintiff "was able to assert himself...in a calm way" and "is also learning social skills." (Tr. 653). On February 28, 2006, Dr. Blackbird characterized Plaintiff's "degree of progress" as "overall positive." (Tr. 650).

On March 20, 2006, Plaintiff was examined by Dr. Jeffrey Kramer. (Tr. 636-37). Plaintiff reported that he was "doing quite well" and "has been attending occupational therapy, working on budgeting, meal prep, organization and meds." (Tr. 636). A physical examination revealed that Plaintiff "gets up easily from the exam table and ambulates down the hallway with a symmetric smooth gait." (Tr. 636). Plaintiff exhibited "intact strength in both lower extremities" and "does not lose his balance." (Tr. 636). The doctor observed that Plaintiff "continues to require the supportive environment at Hope Network and he seems to be doing quite well with this." (Tr. 637).

On April 12, 2006, Plaintiff was examined by Dr. Holwerda. (Tr. 720-21). Plaintiff reported that "overall he feels he is doing okay," but "still has a few down episodes here and there." (Tr. 720). The doctor reported that staff members at Hope Network "feel that overall [Plaintiff] has been doing quite well" and "relates well to the other residents." (Tr. 720). Moreover, "no one [on

14

the staff] had any specific concerns regarding how [Plaintiff] has been doing over the last month."

(Tr. 720).  Dr. Holwerda reported that Plaintiff "seems to be doing better again, with the Wellbutrin

and Seroquel combination."  (Tr. 720).  On June 7, 2006, Plaintiff reported to Dr. Holwerda that "he

thinks the increase in the Wellbutrin has been helpful because he is not down as much."  (Tr. 718).

> Treatment notes dated July 17, 2006, reveal the following:
>
> The patient continues living and working at Sojourner's.  He is in the
> vocational room as well as the cleaning crew, working about 20 hours
> per week.  He thinks he can tolerate more.  He is attending AOS for
> drug and alcohol rehab two days per week and AA two times per
> week.  He has been seen in speech therapy working on  computer
> skills, OT working on independent living skills, and is also being seen
> by vocational as well as behavioral specialists.

(Tr. 714).

On August 30, 2006, Plaintiff was examined by Dr. Holwerda.  (Tr. 716-17).  The

doctor noted that "there were some reports the first part of August that [Plaintiff] was not taking his

medication, primarily the Wellbutrin."  (Tr. 716).  The doctor noted that after being confronted by

staff members, Plaintiff "has since been taking his medicine more regularly."  (Tr. 716).  Plaintiff

reported that "once he got back on the medication, he noticed his irritability was less."  (Tr. 716).

Dr. Holwerda reported that "on talking with the rest of the team, they feel that [Plaintiff] has been

doing okay now that he is back on the medicines."  (Tr. 716).  Plaintiff appeared "slightly

dysthymic," but a mental status exam was otherwise unremarkable with "no overt symptoms of

psychosis."  (Tr. 716-17).

On September 5, 2006, Plaintiff reported that his mood was "better since I started

taking my meds regularly."  (Tr. 737).  Plaintiff also reported that he is "not causing any trouble and

going to all my classes."  (Tr. 737).  Plaintiff also reported that he "obtained a job a Panera Bread

15

and will be starting in two weeks." (Tr. 737). Three days later Plaintiff reported that his "job fell

through because the transportation could not be arranged." (Tr. 737).

On September 19, 2006, Bob O'Brien, MA, LLP, a behavioral specialist with Hope

Network, reported that:

> [Plaintiff] seems to be beyond the need for the sheltered vocational
> programs and the [adult foster care] level of care. We will place him
> on a track for finding a job more aggressively and work on a viable
> discharge plan that will involve a less restrictive level of care. This
> may be a CLP apartment or some other option to be explored with his
> guardian and the core clinical team. [Plaintiff] has outgrown the
> residential and vocational opportunities on campus. They are
> becoming detrimental to his progress in the sense that he has reached
> a comfort level that prevents him from moving forward. He needs a
> push out of the comfortable nest.

(Tr. 732-33).

On September 26, 2006, Plaintiff reported to Mr. O'Brien that he "is settled into his

new home" and was experiencing "no problems since the move." (Tr. 731). O'Brien reported that

Plaintiff "seems to be able to look forward into the future and have a reasonable vision of how he

can become more responsible, get a job, and move towards independent living." (Tr. 731). On

September 29, 2006, O'Brien reported that Plaintiff "appears to have improved his compliance and

has met both the letter and the spirit of our agreement." (Tr. 731).

On October 3, 2006, Plaintiff met with Bob O'Brien. (Tr. 730). O'Brien reported

that:

> [Plaintiff] and I had a frank discussion about his honesty in
> conjunction with his working on the first step of AA. He believes he
> has completed the first step and is moving onto the second step.
> Although I am not doing alcohol counseling with him, I took the
> opportunity to point out how his lack of him being honest with
> himself and others is a form of denial and is very similar to the

16

defense mechanisms he employed to continue to drink.  We then spent quite a bit of time connecting the dots between the defense mechanisms he uses and how he has avoided taking responsibility with his treatment. [Plaintiff] achieved some insight about this and I believe it was a rather good session. [Plaintiff] and I continued our discussion of his avoidance of responsibility, his dishonesty, his avoidance of immediate pain despite the assurance of more severe consequences later.  He has responded well to the combination of counseling of this type along with a strict statement of the consequences of failure to accept responsibility for cooperating with his treatment.  We discussed this in the context of his working of the first step of his AA program as applied to the defense mechanisms he has employed.  He has improved his outlook and cooperation immensely.  I believe he has increased his chances of success and we agree that he has made a cognitive and emotional switch that will see him through his transition if he can sustain it.

(Tr. 730).

On October 9, 2006, Plaintiff met with Bob O'Brien.  (Tr. 729).  O'Brien observed that Plaintiff now "has the insight that lying to himself with keep him going backward and he has too much to lose."  (Tr. 729).  O'Brien also noted that Plaintiff "is learning the value of responsibility and he can't let everyone take care of [him] anymore."  (Tr. 729).  Plaintiff reported that he is "ready to get a job; it doesn't matter where it's at."  (Tr. 729).  O'Brien observed that Plaintiff "is maintaining a positive mood and attitude."  (Tr. 729).  Treatment notes dated October 16, 2006, by Mr. O'Brien indicate that Plaintiff "has excellent report from social work, vocational services, residential services and recreational therapy."  (Tr. 728).

On December 6, 2006, Dr. Blackbird reported that Plaintiff "worked hard with me in counseling and I felt positive about the progress he made in dealing with adjustment to traumatic brain injury, which was further complicated by a fairly deprived childhood and by his having learned

to cope via alcohol or lashing out." (Tr. 742). The doctor further noted that Plaintiff "can be successful and quite genial." (Tr. 742).

On January 23, 2007, Plaintiff was examined by Dr. Scott Jahnke. (Tr. 762-63). Plaintiff reported that he was experiencing "chronic back pain, bilateral leg pain and some neck discomfort as well." (Tr. 762). The results of a physical examination revealed the following:

> Deep tendon reflexes in the upper extremities are 2/4 bilaterally and equal. Muscle strength 5/5. Sensory examination intact to light touch. Patient's peripheral pulses are 2/4. Patient has full range of motion of the upper extremities. Good rotator cuff strength. Patient's cervical range of motion is full. He does have some palpable tenderness in the right upper cervical region with negative Spurling's sign. Patient's lumbar spine reveals no palpable tenderness along the paravertebral musculature as well as along the lumbar facet region. Diffuse tenderness over the SI area. He does have a fairly level pelvis, no obvious leg length discrepancies. Lower extremity deep tendon reflexes are 1/4 at the knees and ankles. Muscle strength is 5/5. Sensory examination is intact to light touch in his feet. There are some patchy dysesthesias in the left lower extremity. He has negative Faber's test, negative Flip sign. Straight leg raising sign does reveal some increased pain on the left lower extremity.

(Tr. 763).

On February 28, 2007, Plaintiff began participating in physical therapy. (Tr. 756-57). An initial physical therapy evaluation revealed that Plaintiff "has headaches that seem to be mostly secondary to muscle tension problems with overall poor cervical stability." (Tr. 757). It was further noted that "there is also low back pain that has a mechanical component on the lower thoracic and poor stability on the low back with increased neural tension." (Tr. 757).

On May 1, 2007, Plaintiff was examined by Dr. Jahnke. (Tr. 754). The doctor observed that Plaintiff "is much more relaxed" and "seems to be doing overall quite a bit better." (Tr. 754). Plaintiff reported that "the physical therapy dramatically helped his headaches." (Tr. 754).

18

Treatment notes dated May 1, 2007, reveal that Plaintiff "has now moved into his own apartment" and that his "back pain is reportedly doing well, but headaches continue to be problematic." (Tr. 785).

At the administrative hearing, Plaintiff's guardian, Julie Bronsink, testified regarding Plaintiff's impairments and limitations. Bronsink reported that Plaintiff "has difficulty with problem solving, judgment issues" and is "impulsive" and "highly distracted." (Tr. 826). She further reported that Plaintiff "has trouble with concentrating, so kind of more the executive level functioning, parts of his brain don't work the way that yours or mine do and so I kind of am the one that tries to keep his finances and his appointments and scheduling and that kind of thing so that he doesn't miss things." (Tr. 826). Bronsink testified that Plaintiff lives "independently" in "his own apartment" and obtained a driver's license and drives his own vehicle. (Tr. 828-29). Bronsink reported that Plaintiff is "functioning okay" and "is attending AA." (Tr. 829-30).

## ANALYSIS OF THE ALJ'S DECISION

The Social Security Act provides that disability benefits may be terminated if "the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling." 42 U.S.C. § 423(f). Termination of benefits must be supported, however, by substantial evidence that (1) there has been medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (2) the individual is now able to engage in substantial gainful activity. *See* 42 U.S.C. § 423(f)(1)(A)-(B); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994); *Niemasz v. Barnhart*, 155 Fed. Appx. 836, 840 (6th Cir., Nov. 18, 2005)

19

("[o]nce an ALJ finds a claimant disabled, he must find a medical improvement in the claimant's condition to end his benefits, a finding that requires 'substantial evidence' of a 'medical improvement' and proof that he is 'now able to engage in substantial gainful activity'") (quoting 42 U.S.C. § 423(f)(1)).

The social security regulations articulate an eight-step sequential process by which determinations of continuing disability are made.[3]  *See* 20 C.F.R. §§ 404.1594, 416.994.  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  The steps of this sequential process are as follows:

(1)     Is the individual engaging in substantial gainful activity;

(2)     Does the individual have an impairment or combination of impairments which meets or equals in severity an impairment identified in the Listing of Impairments;

(3)     Has the individual experienced a medical improvement;

(4)     Is the improvement related to the individual's ability to perform work (i.e., has there been an increase in the individual's residual functional capacity based on the impairment(s) present at the time of the most recent favorable medical determination);

(5)     If the individual has either not experienced a medical improvement or any such improvement is unrelated to his ability to perform work, do any of the exceptions to the medical improvement standard apply;

(6)     Does the individual suffer from a severe impairment or combination of impairments;

(7)     Can the individual perform his past relevant work;

---

[3]  This eight-step sequential process clearly applies in cases where a claimant, previously found to be disabled, is later found to be no longer be disabled.  This sequential process also applies in closed benefits cases such as this, where the finding of disability and termination of disability are rendered in the same decision.  *See Niemasz*, 155 Fed. Appx. at 836-40.

(8)    Can the individual perform other work;[4]

*Id.*

Furthermore, when the Commissioner evaluates whether a claimant continues to qualify for benefits, the claimant is not entitled to a presumption of continuing disability. *See Cutlip*, 25 F.3d at 286.  Rather, the decision whether to terminate benefits must "be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition."  *Id.*

The ALJ determined that Plaintiff suffers from: (1) closed head injury, (2) right knee fracture, (3) right clavicle fracture, (4) subdural hemorrhage, and (5) a history of polysubstnace abuse, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 29-42).  The ALJ found that from February 28, 2004, through September 30, 2006, Plaintiff "had a very restrictive residual functional capacity" that prevented him from performing full-time work activities.  (Tr. 32).  The ALJ further concluded, however, that as of October 1, 2006, Plaintiff experienced a medical improvement in his condition. (Tr. 40).

The ALJ found that Plaintiff's improvement was related to his ability to work as such resulted in an increase in his residual functional capacity.  (Tr. 40-43).  Specifically, the ALJ determined that as of October 1, 2006, Plaintiff was capable of performing a limited range of light work.  (Tr. 42).  Specifically, the ALJ found that as of October 1, 2006, Plaintiff retained the ability to perform work activities subject to the following restrictions: (1) he is limited to simple, repetitive

---

[4]  While not expressly stated in the regulations, it is clear that "other" work refers to work which exists in significant numbers.  *See*, *e.g.*, *Mote v. Shalala*, 1995 WL 358636 at *12 (N.D.Ind., May 12, 1995).

21

work tasks, (2) he can lift/carry 20 pounds occasionally and 10 pounds frequently, (3) he can stand and/or walk for two hours during an 8-hour workday, (4) he can sit for six hours during an 8-hour workday, (5) he cannot kneel, crouch, or crawl, or climb ladders, ropes, and scaffolds, (6) he can only occasionally balance, stoop, or climb ramps and stairs, and (7) he must avoid concentrated exposure to hazards such as dangerous moving machinery and unprotected heights.  (Tr. 42). Relying on the testimony of a vocational expert, the ALJ found that while Plaintiff was unable to perform his past relevant work there existed a significant number of jobs he could perform despite his limitations.  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

        a.      Treating Physician Doctrine

Plaintiff asserts that "[t]his Court is obligated to follow *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 546 (6th Cir. 2004)," a case in which the Sixth Circuit held that if an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so.  *Id.* at 544.  Thus, Plaintiff argues that the ALJ violated the treating physician doctrine by failing to accord appropriate weight to the opinions expressed by his treating physicians. Plaintiff has failed, however, to identify *any* opinion in support of this argument or to which the ALJ failed to properly defer.  Plaintiff has instead forced the Court to divine from an administrative record in excess of 800 pages the basis for this insufficiently developed argument.  As a result of Plaintiff's failure to properly develop this argument, such is rejected.  *See, e.g., Porzillo v. Department of Health and Human Services*, 369 Fed. Appx. 123, 132 (Fed. Cir., Mar. 12, 2010) (claimant "waves any arguments that are not developed"); *Shaw v. AAA Engineering & Drafting,*

22

*Inc.*, 213 F.3d 519, 537 n.25 (10th Cir. 2000) (arguments "superficially" developed are waived); *Financial Resources Network, Inc. v. Brown & Brown, Inc.*, 2010 WL 4806902 at *30 n.29 (D. Mass., Nov. 18, 2010) (same).

      b.     Date of Physical Improvement

Plaintiff next asserts that the ALJ erred by identifying October 1, 2006, as the date on which he experienced medical improvement in his condition related to his ability to work. Specifically, Plaintiff asserts that because there exists no medical record generated on this date, the ALJ's determination on this question is erroneous.

In support of his argument, Plaintiff cites to a Report and Recommendation issued by the Honorable Hugh W. Brenneman in *Mueller v. Commissioner of Social Security*, 1:09-cv-695, dkt. #13 (W.D. Mich). In that case, the ALJ found that the claimant had experienced medical improvement in his condition as of January 1, 2007. This determination was based on items in the administrative record between May 2006 and May 2007. Judge Brenneman found that the ALJ's conclusion that the claimant experienced medical improvement in his condition as of January 1, 2007, was not supported by substantial evidence because "the January 1, 2007 date appears to be an arbitrary date. . .not related to any particular occurrence or examination." *Id.* at 8-9. This recommendation was subsequently adopted by the Honorable Gordon J. Quist.

As the Sixth Circuit has recognized, an ALJ's decision regarding the date on which a claimant's disability ended need not be supported by "smoking gun medical documents" generated on the date in question. *White v. Commissioner of Social Security*, 572 F.3d 272, 285 (6th Cir. 2009). Instead, the ALJ's determination as to the date on which a claimant's disability ended must

simply be "not so wholly arbitrary so as to carry the ALJ's decision outside the 'zone of choice' that the ALJ possesses in rendering disability decisions." *Id.*

In the present case, the decision that Plaintiff's disability ceased as of September 30, 2006, is supported by substantial evidence. As detailed above, Plaintiff's condition steadily improved throughout 2006 and by September 2006 it was reported that Plaintiff no longer needed "sheltered vocational programs and the [adult foster care] level of care." Instead, it was recommended that Plaintiff seek employment and independent living. The medical evidence dated after October 1, 2006, supports the ALJ's conclusion that as of September 30, 2006, Plaintiff's disability ceased. Unlike the circumstance in *Mueller*, the ALJ's determination as to the date on which Plaintiff's disability ceased was not arbitrarily selected, but is instead supported by substantial evidence. This argument is, therefore, rejected.

c. Plaintiff's RFC

Plaintiff next asserts that the ALJ's RFC determination is faulty because it fails to contain any limitations related to his mental impairments. As detailed above, the evidence of record reveals that by the fall of 2006, Plaintiff experienced a significant improvement in his condition and was functioning at a relatively high level when he took his medications. In his RFC determination, the ALJ expressly limited Plaintiff to simple and repetitive work tasks. This limitation sufficiently accounts for the non-exertional limitations Plaintiff was experiencing as of October 1, 2006. Accordingly, the Court finds that the ALJ's RFC determination is supported by substantial evidence.

d.    Plaintiff is not Entitled to Remand

In the final sentence of his brief, Plaintiff requests that the Court remand this case to the Social Security Administration pursuant to Sentence Six of 42 U.S.C. § 405(g).  This argument appears to be based on evidence that Plaintiff first submitted to the Appeals Council when seeking review of the ALJ's decision.  (Tr. 8-15).  The Appeals Council received this evidence into the record and considered it before declining to review the ALJ's determination.  (Tr. 5-19).  This Court, however, is precluded from considering such material.  In *Cline v. Commissioner of Social Security*, 96 F.3d 146 (6th Cir. 1996), the Sixth Circuit indicated that where the Appeals Council considers new evidence that was not before the ALJ, but nonetheless declines to review the ALJ's determination, the district court cannot consider such evidence when adjudicating the claimant's appeal of the ALJ's determination.  *Id.* at 148; *see also*, *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007) (quoting *Cline*, 96 F.3d at 148).

If Plaintiff can demonstrate, however, that this evidence is new and material, and that good cause existed for not presenting it in the prior proceeding, the Court can remand the case for further proceedings during which this new evidence can be considered.  *Cline*, 96 F.3d at 148.  To satisfy the materiality requirement, Plaintiff must show that there exists a reasonable probability that the Commissioner would have reached a different result if presented with the new evidence.  *Sizemore v. Secretary of Health and Human Serv's*, 865 F.2d 709, 711 (6th Cir. 1988).

The evidence in question reveals that Plaintiff was admitted to the hospital on October 8, 2009, for treatment of injuries suffered in a fall from a bridge.  (Tr. 14-15).  Plaintiff was discharged from the hospital on October 28, 2009.  (Tr. 10).  Treatment notes dated November 19, 2009, indicate that Plaintiff "met his physical therapy and occupational therapy goals" and was in

25

"stable" condition.  (Tr. 8-9).  This evidence demonstrates that Plaintiff suffered injuries in an isolated accident and that he quickly recovered therefrom.  Considering that this accident occurred almost two years after the ALJ's decision, such sheds no light on Plaintiff's condition during the time period relevant in this matter.  It is not reasonable to assert that consideration of this material by the ALJ would have led to a different result.  Accordingly, the Court is precluded from considering this evidence and, furthermore, there exists no basis for remanding this matter for its further consideration.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within such time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  September 15, 2011

   /s/ Ellen S. Carmody                      
ELLEN S. CARMODY
United States Magistrate Judge